UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

RNA CORPORATION,

     Plaintiff and
     Counterclaim Defendant,

v.

THE PROCTER & GAMBLE
COMPANY,

     Defendant and
     Counterclaimant.

Civil File No. 1:08-cv-05953

**THE PROCTER & GAMBLE
COMPANY'S REPLY
MEMORANDUM IN SUPPORT
OF DAMAGE AWARD**

## INTRODUCTION

The essence of this dispute is the infringement of P&G's intellectual property. RNA claims, without any evidence, that P&G's motivation is to squash legitimate competition. But the *evidence* in this case demonstrates that P&G's goal has been nothing more than protecting what every owner of intellectual property must do to protect innovation: insist, through legal means if necessary, that infringers stop their infringement. P&G has never objected to RNA, or any other competitor, whether a multi-national corporation or a mid-sized manufacturer,[1] selling shampoos and conditioners that might be cheaper or otherwise distinct from P&G's. If RNA chooses to sell a product that is comparable to and competes with P&G's HERBAL ESSENCES products – even by saying explicitly, "Compare to P&G's product" – it can freely do so. What it is *not* entitled to do is copy trade dress and infringe patented bottle shapes and registered trademarked logos.

For this reply brief, P&G relies upon the June 15, 2010, Second Declaration of Peter Lancaster, filed with this memorandum; the May 20, 2010, Declaration of Katherine Ruwe (Doc. 85), and the May 25, 2010, Declaration of Peter M. Lancaster (Doc. 86); both filed with P&G's Memorandum in Opposition to RNA's Claim For Damages ("P&G Opp. Mem."); the Declarations filed with P&G's November 19, 2009, Memorandum in Support of Damage Award ("P&G Mem."); and the Declarations of Christopher Keith ("Keith Decl."), Vicki Christiansen

---

[1] Though RNA makes much of P&G's size, it obviously possesses sufficient resources to pay its lawyers to prolong this case for nearly two years.

("Christiansen Decl."), and Christopher R. Parker ("Parker Decl.") filed with P&G's Motion for Preliminary Injunction (Doc. 14), along with the other files and records in this case.

**ARGUMENT**

## I.  IT IS RNA WHO HAS MULTIPLIED EXPENSE AND DELAY IN THIS CASE

RNA vigorously argues that P&G is at fault for the time and cost of resolving this case. The simple chronology of the four central events in this case rebuts those arguments.  The four central events are (1) RNA's insistence on massive document productions from P&G between February and April 2009; (2) the entry of a Preliminary Injunction on May 19, 2009; (3) the entry of the Consent Decree and Permanent Injunction on April 19, 2010; and (4) the completion of this damage resolution process.  For each of those four events, P&G attempted to accomplish them as quickly and inexpensively as possible.  RNA regularly offered vague and unenforceable assurances that it would do what P&G proposed, but it repeatedly delayed in committing to enforceable agreements.

### RNA's Insistence On Expensive Discovery between February and April 2009.

RNA forced P&G to respond to voluminous discovery requests between February and April 2009.  RNA forced P&G to choose between (a) giving up on obtaining an enforceable commitment from RNA or (b) satisfying RNA's massive document requests.  *See* Second Lancaster Decl. Ex. B.  RNA made clear that the price of P&G *not* producing the demanded documents would be longer delays in obtaining RNA's commitment to stop selling infringing products.  P&G could not acquiesce in RNA's blatant knock-off of its intellectual property without risking the loss of its trademark, trade dress, and design patent rights.  Reviewing over 157,000 pages of potentially responsive pages and producing nearly 40,000 pages was the single most expensive event in this case, costing P&G over $100,000.  Redmond Decl. ¶13.  To date, despite previously insisting that the discovery was essential, RNA has never cited or based any argument on *a single one* of the tens of thousands of documents it demanded.  So far, there is no evidence that it even *looked at* the massive set of documents it demanded.  As detailed in the Redmond Declaration (Doc. 61), even though RNA had insisted that discovery was essential, it failed to serve, respond to, or produce its own discovery in compliance with the Court's scheduling order, to which RNA had stipulated.  It produced just 41 pages of documents, Redmond Decl. ¶12, along with a handful of later financial documents that did not include the

Production Cost document on which it now relies. *See* Second Lancaster Decl. ¶2. RNA's insistence on P&G's discovery responses was nothing more than a burden-imposing and delay-inducing tactic, for which P&G submits there should be some financial consequence.

**RNA's Eight-Month-Delayed Stipulation to a Preliminary Injunction**. From the time the Ohio case was filed on August 22, 2008, RNA knew that P&G felt that it needed an enforceable commitment from RNA to stop selling its knock-off products. Informal and unenforceable assurances, which have always been easy to obtain from RNA, were insufficient. That concern, obviously, is why P&G filed its preliminary injunction motions in both Ohio and Illinois. It was not until April 20, 2009, almost exactly eight months after P&G filed its initial Complaint in Ohio, that RNA finally executed a Stipulated Temporary Injunction (Doc. No. 42). Eight months after P&G first notified RNA of the need for such an injunction, the language the injunction contained was language that P&G proposed. That delay was wholly attributable to RNA, which waited until after its supplier told RNA its prices were not competitive. *See* Harms Decl. Ex. A, attached as Ex. B to RNA Opp. Mem., and after it had forced P&G to incur massive discovery expense before agreeing to the order.[2]

**RNA's Twenty-Month Delayed Stipulation to the Consent Decree and Permanent Injunction**. As was the case for the preliminary injunction, RNA knew from August 2008 that P&G's ultimate goal in this case was a permanent injunction. It could have cut off virtually all expense in this case by agreeing at the beginning of the case to the Consent Decree and Permanent Injunction to which it eventually did agree. P&G proposed reasonable terms for such an Order on March 11, 2009, and proposed the exact language of all terms eventually agreed to on July 22, 2009. *See* Second Lancaster Decl. Ex. C. RNA did not sign the document until April 15, 2010, nearly <u>twenty months</u> after P&G submitted its formal Complaint, <u>over thirteen months</u> after P&G's first documented proposal and <u>nearly nine months</u> after P&G proposed the exact injunction language to which RNA eventually agreed. P&G was not responsible for that delay or expense.

**RNA's Eight-Month Delayed Acceptance of this Damage Resolution Process**. P&G told RNA that it was willing to submit damage issues to the Court *before* the August 21, 2009 settlement conference. On September 18, 2009, the Court proposed exact language for briefing

---

2    The Family Dollar letter was withheld from P&G during discovery. *See* Second Lancaster Decl. ¶2.

the issues, to which P&G promptly communicated its agreement.  *See* Second Lancaster Decl. Ex. D.  RNA refused.  After interminable discussions with RNA, P&G tried to end the delays in completing the simple briefing process by commencing the process unilaterally with its own brief on November 19, 2010.  It took four more Court conferences to fix the simple schedule finally entered on April 19, 2010 (Doc. 78).  The simple matter of fixing a briefing schedule thus took <u>over seven months,</u> and several thousand dollars of negotiation and travel, to complete *after* P&G had already communicated its willingness to accept the Court's proposal.  P&G was not responsible for that delay or expense.

## II.  <u>P&G HAS ESTABLISHED ITS LIABILITY CLAIM</u>

P&G did not plan to re-produce, in this *damage*-resolution process, the law and evidence establishing why P&G would have prevailed on the liability issues in this case had RNA produced a substantive defense.  Until now, RNA has never produced any reason why its actions do not constitute patent, trademark, and trade dress infringement.  That is surely why the parties had agreed that this phase of proceedings was a *damages* phase.  The Order Governing Damage Resolution Process confirms that approach.  It states that the parties:

> have entered into a separate Consent Decree and Permanent Injunction **resolving all claims** the parties asserted . . . , **except those claims for damages** as set forth in this Order;

> WHEREAS P&G asserts that it is entitled to damages as a result of the alleged infringement by RNA;

> WHEREAS **RNA contends that P&G is not entitled to any such damages, including because RNA did not profit** from any acts for which it is agreeing to the entry of permanent injunctive relief . . .; and

> WHEREAS RNA asserts that it is entitled to damages in the form of attorneys' fees; . . .

> To resolve the parties' **dispute as to damages**, they have agreed to have this Court . . . hold a **trial on damages** . . .

Order Governing Damage Resolution Process (Doc. 78) (emphases added).  This, then, was to be a proceeding about *damages*.  Thus, not only did RNA *not* reference any challenge to the *liability* issues it conceded through its stipulated commitment to avoid future infringement, it identified no *damage* issues other than its claimed lack of profits.  Now, after depriving P&G of discovery

4

it was obligated to provide, it relies heavily on liability rather than damage arguments to avoid any financial consequence for its actions. These are its two principal liability arguments:

- RNA continues to assert that it could not have committed patent infringement because its supplier owns a design patent.
- RNA asserts that the affixation of the Family Dollar name provides license to copy all other features of P&G's packaging.

Neither of those arguments provides any license to commit the copying established by one look at RNA's products and the documented admissions relating to them.

### A. **RNA's Main Liability Arguments Are Unpersuasive**

P&G rebutted RNA's lead liability argument on patent infringement – the argument that GK Packaging's design patent eliminates its own liability for patent infringement – at length in its opposition brief. *See* P&G Opp. Mem. at 3-5. On both factual and legal grounds, there is no basis for RNA's argument, whatever lawyers obtained the irrelevant GK patent.

RNA's argument that affixing the Family Dollar name to its bottles provide a license to copy P&G's trademarks, trade dress, and patented designs is equally unpersuasive. RNA relies almost solely on a single case, *Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556 (Fed. Cir. 1994). In *Conopco*, a discount retailer produced a copy-cat private label version of Vaseline Intensive Care Lotion labeled with a retailer's logo. The Federal Circuit held that ten years of side-by-side sales without confusion supported the trial court's conclusion that no likelihood of confusion existed. *Id.* at 1568. That holding, based upon a different history, does not insulate knock-offs like RNA's. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:43 (2010). "[W]here the trade dress is distinctive and the products so closely resemble each other, labeling cannot preclude the possibility that confusion will occur." *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, 1999 WL 47191, at *24 (S.D.N.Y. Feb. 2, 1999) (quoting *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F. Supp. 394, 411 (S.D.N.Y. 1989)); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 638 F. Supp. 652, 656 (S.D.N.Y. 1986) (holding that use of house name did not excuse the infringement "since it may instead simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark"), *rev'd on unrelated grounds*, 841 F.2d 486 (2d Cir. 1988).

A substantial risk when a seller acts as RNA has is that even a consumer who *studies* RNA's bottles will conclude that the similarity in packaging indicates that P&G must have

licensed Family Dollar to private-label P&G's product. Courts have viewed adding a house mark to copycat designs as an aggravating rather than a mitigating circumstance for exactly this reason. *McNeil-PPC, Inc. v. Guardian Drug Co., Inc.*, 984 F. Supp. 1066, 1072 (E.D. Mich. 1997); *T & T Mfg. Co. v. A. T. Cross Co.*, 449 F. Supp. 813, 822 (D.R.I. 1978) (citing *Menendez v. Holt*, 128 U.S. 514, 524 (1888)); *NEXxUS Prod. Co. v. Gentle Concepts, Inc.*, 1993 WL 496824, at *5 (M.D. Fla. April 30, 1993). As the *NEXxUS* court reasoned, "Such combinations [of the infringer's house mark with the plaintiff's trademark] may lead buyers to assume the infringer is an authorized branch of the owner of the trademark." *Id.* The Seventh Circuit has recognized that consumers viewing the parties' similar trademarks may suffer such confusion. *See, e.g., Badger Meter v. Grinnell Corp.*, 13 F.3d 1145, 1152 (7th Cir. 1994) (finding it likely that defendant's similar trade dress may lead consumers to believe that defendant's product was a private-label version of plaintiff's product).

RNA's miniscule disclaimer stating "THIS PRODUCT IS NOT DISTRIBUTED BY PROCTOR [sic] AND GAMBLE" and "COMPARE to Herbal Essences Shampoo®" does not cure confusion, either. Christiansen Decl. Ex. D. Such disclaimers do not provide a license to appropriate others' trademark rights. As the leading trademark treatise has observed, "many courts have held that a disclaimer does not serve to cure an otherwise clear case of likely confusion. Consumer studies indicate that disclaimers are ineffective in curing customer confusion over similar marks. In fact, in some instances, the use of a disclaimer can serve to aggravate, not alleviate, confusion over brands." 4 McCarthy, § 23:51 (citations omitted); *accord Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) ("plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by customers"); *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, 2004 WL 2967446, at *14 (N.D. Ill. Nov. 15, 2004) ("courts have recognized that disclaimers, by themselves, do not sufficiently limit the harm to a trademark owner").

Equally important, P&G has been harmed even if a consumer eventually realizes that the RNA copy is not a true P&G product. RNA's copycat design creates "initial interest" confusion, "initially drawing customers to its product through the similarity in trade dress . . . confus[ing] the consumer at the point when he first reaches for the product on the shelf." 4 McCarthy § 23.6. This "'bait and switch' . . . will affect the buying decisions of the consumers when it permits the

competitor to 'get its foot in the door' by confusing the consumers." *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996); *Turbo Tek Enters. v. F.P. Feature Prods., Inc.*, 1987 WL 19558, at *13 (N.D. Ill. Oct. 7, 1987) (Zagel, J.) ("an inferior product can taint a consumer market" and "consumers who purchase an inadequate, poorly manufactured or non-working [product] . . . may be permanently lost to [plaintiff's] market").

At best for RNA, the Seventh Circuit rule is that a house logo is one factor to weigh among the seven likelihood of confusion factors.[3] As the next section explains, governing law establishes trademark, trade dress, and design patent infringement.

## B. Standard Liability Analyses Establish Liability in This Case

As Judge Easterbrook observed in *Top Tobacco, L.P. v. N. Atlantic Operating Co.*, 509 F.3d 380, 381 (7th Cir. 2007), sometimes a look at two products' packaging is sufficient to decide trademark and trade dress cases: "This case illustrates the power of pictures. One glance is enough to decide the appeal." Where, as here, the marks and the product packaging are virtually identical, there is a strong presumption that confusion is likely. *See, e.g.*, *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190-91 (6th Cir. 1988) ("Obviously, since both marks use absolutely identical language to sell a nearly identical service, the likelihood of confusion must be considered great"); 4 McCarthy § 23:20 ("cases where a defendant uses an identical mark on competitive goods . . . are 'open and shut'").

### 1. RNA Is Liable for Trademark Infringement

Proving trademark infringement requires a showing that (1) P&G owns a protectable trademark; and (2) RNA is using a trademark that is likely to cause confusion. *E.g.*, *Ty, Inc. v. Jones Group*, 237 F.3d 891, 897 (7th Cir. 2001); *Int'l Kennel Club*, 846 F.2d at 1084. P&G's ownership of U.S. Trademark Reg. No. 3,337,074 for the HERBAL ESSENCES Logo, *see* Christiansen Decl. Ex. B, establishes a presumption that the trademark is valid and protectable under federal law. *See* 15 U.S.C. § 1115(a) (registration on the Principal Register "shall be prima facie evidence of the validity of the registered mark"). RNA does not challenge the

---

3   The Seventh Circuit cases cited by RNA to support its argument that the Family Dollar logo should outweigh all the other confusion factors are unlike this case. The opinions cited at the top of page 13 rely on the fact that the claimed trade dress is product configuration, as opposed to the trademark, trade dress, and patent claims here. The trademark cases cited by RNA on page 16 all involved expensive goods and/or sophisticated purchasers, unlike the goods and consumers relevant here.

validity or protectability of P&G's logo. P&G therefore need address only the Seventh Circuit's seven likelihood of confusion factors to demonstrate infringement.

A consideration of the factors and the simple act of comparing photographs of the parties' products leads inexorably to the conclusion that RNA's imitation of the HERBAL ESSENCES Logo is confusing for the buying public.[4]

**Factor 1: The Marks' Confusing Similarity.** "Similarity of the marks is one of the three most important factors in any trademark case." *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983). When considering this factor, the respective marks must be considered "in their entireties . . . in light of what occurs in the marketplace." *James Burroughs Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976); *see also Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997); *Ty*, 237 F.3d at 897. When viewed in their entireties, the similarity of the logos used by the parties demonstrates a likelihood of confusion. The logo RNA employed on its shampoo and conditioner products was plainly intended to mimic the HERBAL ESSENCES Logo, as is apparent from a side-by-side comparison, with P&G's registered logo on the left:



Both logos include, against a blue background: (1) a circle; (2) the same shade of green as the principal color; and (3) a vinelike device on top of the circle. *See* Christiansen Decl. Ex. C. Even though not *identical* to the HERBAL ESSENCES Logo, the logo used on RNA's competing shampoos and conditioners clearly creates the risk that a consumer familiar with the HERBAL ESSENCES Logo would confuse the two logos.

---

[4] Apart from the presumptions afforded registered marks, analysis of P&G's common law trademark and trade dress rights follows the same basic standards. *E.g.*, *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir. 1998).

**Factors 2 and 3: The Type of Products and Sales Through the Same Trade Channels.** Courts are to assess whether "there is any relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Ty*, 237 F.3d at 900 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). Here, the analysis requires little effort, because HERBAL ESSENCES shampoos and conditioners were directly competitive with RNA's Hydrating Herbal shampoos and conditioners and, in fact, sold adjacent to each other in Family Dollar stores, as depicted here:



Christiansen Decl. ¶3, Ex. F; *see also* Parker Decl. Exs. A, B. Accordingly, both of these factors weigh heavily in favor of a finding of infringement.

**Factor 4: The Low Degree of Care Consumers of These Products Exercise**. Customers exercise a lower degree of care when services or goods are inexpensive, increasing the chances for confusion to occur. *See, e.g., CAE, Inc. v. Clear Air Eng'g, Inc.*, 367 F.3d 660, 683 (7th Cir. 2001) ("the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases); *Pure Imagination*, 2004 WL 2967446, at *7 (confusion more likely when purchaser exercises low level of care). The shampoos and conditioners at issue were sold for less than five dollars each and could be found side-by-side on store shelves. Christiansen Decl. Ex. F; Parker Decl. Exs. A, B. Where inexpensive competing goods are sold in close proximity, the likelihood of confusion is considerable. *See, e.g., McNeil-PPC*, 984 F. Supp. at 1071-72.

**Factor 5: The Strength of the HERBAL ESSENCES Logo**. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to

identify the goods sold under the mark as emanating from a particular . . . source." *Sands,*
*Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992) (quoting *McGregor-*
*Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). "The crucial question is
whether the mark is strong enough that the public will form an association between the mark and
the source of that particular good." 2 McCarthy § 11:73. A strong mark favors a finding of
likely confusion. *See James Burroughs*, 540 F.2d at 276. A fanciful mark like the HERBAL
ESSENCES Logo is entitled to the highest protection. *Eli Lilly & Co. v. Natural Answers, Inc.*,
233 F.3d 456, 462 (7th Cir. 2000). In addition, the HERBAL ESSENCES Logo has a great deal
of marketplace strength. "[E]xtent of advertising, public recognition, sales and length of use" are
also factors that indicate marketplace strength. *CAE*, 367 F.3d at 685.

The HERBAL ESSENCES Logo is a well-known and valuable asset of P&G. P&G has
devoted substantial efforts to advertising the new design of hair care products bearing the
HERBAL ESSENCES Logo, including over $70 million in media since the redesign of the
products. Keith Decl. ¶13. P&G's expenditures on these promotional efforts have translated
directly into millions of dollars worth of revenue earned under this valuable trademark. The
HERBAL ESSENCES redesign and related advertising resulted in markedly improved sales of
products in that line. For the fiscal year ending June 30, 2007, according to industry data, the
redesigned HERBAL ESSENCES shampoo and conditioner products achieved retail sales
exceeding $250 million, a substantial increase over prior years. From June 30, 2007, until
recently, according to industry data, HERBAL ESSENCES shampoo and conditioner products
achieved retail sales exceeding $275 million, maintaining the substantial sales increases that
followed and resulted principally from, the product redesign. According to industry records,
P&G also achieved a larger proportion of sales of the total overall shampoo/conditioner product
category during the subsequent fiscal years than it had in previous years. *Id.* ¶16. The
overwhelming sales success of products bearing the HERBAL ESSENCES Logo and P&G's
concerted promotion of those products are both factors that have established the HERBAL
ESSENCES Logo as a strong identifier of P&G's goods. Similarly, the redesigned HERBAL
ESSENCES products, including the HERBAL ESSENCES Logo, have been the subject of
significant media attention. *Id.* ¶17. This unsolicited media coverage further confirms that the
HERBAL ESSENCES Logo is a well-known and widely recognized symbol of P&G's products
and the consumer goodwill inherent in them.

**Factor 6: Actual Confusion.** Discovery in this case did not advance far enough to generate evidence of actual confusion. It is well established that "evidence of actual confusion is not essential to a finding of a likelihood of confusion." *Eli Lilly*, 233 F.3d at 465.

**Factor 7: RNA's Deliberate Copying.** "Passing off or palming off occurs when a firm puts someone else's trademark on its own (usually inferior) goods." *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005). Although intentional infringement is not necessary for a finding of likely confusion, deliberate copying is an important factor bearing on the likelihood of confusion. *See Computer Care v. Service Sys. Enters, Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992). "The fact that one actively pursues an objective greatly increases the chances that the objective will be achieved. For this reason, a defendant's intent is an 'important factor' . . . and can even be weighed more heavily than other factors." *Eli Lilly*, 233 F.3d at 465 (citing *Computer Care*, 982 F.2d at 1070 and *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184-85 (7th Cir. 1989)). RNA admits both that it was aware of the HERBAL ESSENCES Logo (along with the entire HERBAL ESSENCES Trade Dress) and that it was trying to copy P&G's redesigned packaging. When one looks at the products, no other conclusion would be plausible. RNA's director of sales and marketing testified:

> When the change came to the . . . P&G Herbal Essence line, . . ., [Family Dollar] asked could you find me a private label version, and we started.
>
> . . . .
>
> I ask[ed] all of my vendors. The only ones who replied says we maybe could design something in cut steel. . . . I don't want to own stainless steel that someone could change the style and it's worthless.
>
> . . . .
>
> The statement [to his vendors] was do you have something similar to the new Herbal Essences bottle.

Parker Decl. Ex. C (Harms Dep. at 44-45, 64-65). Thus, RNA admits that it intentionally copied P&G's redesigned HERBAL ESSENCES packaging, trademarks, and bottle design, and was so focused on staying up-to-date with its copying that it did not want to commit itself to a permanent mold. The lineup of design alternatives RNA considered, all of them mimicking P&G's design, confirm the point. RNA's wrongful intent weighs strongly in favor of establishing liability.

## 2. RNA Is Liable for Trade Dress Infringement

To establish trade dress infringement, P&G must demonstrate that (1) the trade dress is not functional; (2) the trade dress is distinctive, thus indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar. *E.g.*, *Badger Meter*, 13 F.3d at 1151; *Computer Care*, 982 F.2d at 1067-68. The Supreme Court has described trade dress as the "design or packaging of a product" that is sufficiently distinctive "to identify the product with its manufacturer or source." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). "Trade dress" refers to the total image of a product, including features such as size, shape, color, or color combinations, texture, graphics, and labels. *See Computer Care*, 982 F.2d at 1067; *Badger Meter*, 13 F.3d at 1151.

The HERBAL ESSENCES Trade Dress, encompassing the overall appearance of the innovative HERBAL ESSENCES shampoo and conditioner bottles, consists, among other elements, of (a) bottles with sinuous shapes featuring unexpected and asymmetrical curves; (b) shampoo and conditioner bottles whose curves allow them to stand complementary to one another in a "yin/yang" manner; (c) the product's brand name on the front label in white printing; (d) a circular holograph device on the top portion of the label; and (e) a vinelike or organic device on top of the circle. Keith Decl. ¶9. The trade dress is nonfunctional and distinctive, and RNA used a confusingly similar trade dress for its directly competitive goods.

**The Nonfunctionality of the HERBAL ESSENCES Trade Dress.** A product feature is functional and thus unprotectable only if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 33. *See also Turbo Tek*, 1987 WL 19558, at *14 (a functional feature "is one which competitors would have to spend money to design around; it is something costly to do without, rather than costly to have"). RNA has not argued that the trade dress is functional, and there is no plausible argument that either the shape of the HERBAL ESSENCES bottles or the designs printed on them are "essential" to their use or purpose, or that they change the cost or utilitarian quality of the products. *See, e.g.*, *Soft Sheen Prods., Inc. v. Revlon, Inc.*, 675 F. Supp. 408, 416 (N.D. Ill. 1987) (finding bright yellow and red trade dress on plaintiff's shampoo bottles was "plainly non-functional"). None of the features that typically evidence functionality are present here. *E.g.*, *Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.*, 461 F.3d 675, 685 (6th Cir. 2006). There is no reason that the unique and purely aesthetic components of the Trade Dress – *i.e.*, the shapes of the bottles and the colors and

designs imprinted on them – would be necessary for a competitor manufacturing shampoos or conditioners. Furthermore, the bottles embodied in the HERBAL ESSENCES Trade Dress are subject to design patents, which are presumptive evidence of nonfunctionality. *See, e.g., id.* at 683. P&G satisfies this element of its trade dress infringement claim.

**The Distinctiveness of the HERBAL ESSENCES Trade Dress.** Trade dress can possess distinctiveness that is intrinsic or acquired. Either suffices for purposes of the Lanham Act. *See Badger Meter*, 13 F.3d at 1151 (a plaintiff can establish a protectable trade dress "if it can show either that its trade dress is inherently distinctive or that it has acquired secondary meaning"); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). Trade dress is inherently distinctive if it is "sufficiently distinctive to allow consumers to identify the product from the trade dress." *Computer Care*, 982 F.2d at 1069 (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 (11th Cir. 1986)).

The Supreme Court has established a distinction between trade dress cases involving "product packaging" – which can be inherently distinctive – and product design – which cannot be inherently distinctive and which requires a showing of secondary meaning to be protectable. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 214, 215 (2000). "Since the *Wal-Mart* decision, courts have generally used a common sense approach in classifying trade dress as either product or package, asking what is the primary product that the buyer is purchasing." 1 McCarthy § 8:12.50. RNA ignores that basic distinction in citing and relying upon authority. Here, common sense indicates that consumers purchase the parties' shampoos and conditioners; the bottles are packaging, not product. Indeed, the *Wal-Mart* opinion itself described analogous bottles for laundry detergent and soft drinks as packaging. *See Wal-Mart Stores, Inc.*, 529 U.S. at 212, 215.

Packaging such as the HERBAL ESSENCES Trade Dress is "typically" considered inherently distinctive "[s]ince the choices that a producer has for packaging are . . . almost unlimited." *AMD Southfield Michigan L.P. v. Michigan Open MRI LLC*, 337 F. Supp. 2d 978, 982 (E.D. Mich. 2004) (quoting *Mexican Food Specialties, Inc. v. Festida Foods*, 953 F. Supp. 846, 850 (E.D. Mich. 1997)). The HERBAL ESSENCES Trade Dress in particular is an innovative design, and no comparable shampoo and conditioner bottles were on the market before the packaging was first used in 2006. Keith Decl. ¶7; s*ee Computer Care*, 982 F.2d at 1069 (evidence of uniqueness supports a finding that a trade dress is inherently distinctive);

*Turbo Tek*, 1987 WL 19558, at *14. The uniqueness and appeal of the HERBAL ESSENCES Trade Dress is underscored by the acclaim that the packaging has earned in the packaging industry. For example, the industry publication *CPC Packaging* named the HERBAL ESSENCES Trade Dress a winner of its 2007 Editor's Choice Awards, noting that the "[m]odern hues and curvy bottle shapes" of the packages "look so appealing on store shelves that shoppers have literally stopped in their tracks to take a second look." Keith Decl. ¶17, Ex. E at E1. Similarly, the HERBAL ESSENCES Trade Dress won one of *ReBrand 100*'s 2007 "Best of" Awards, which noted that the new packaging employed "a new brand architecture, identity, shape, design, naming strategy and language – all of which communicated a new and different product." *Id.* ¶17, Ex. F at F3. An article about the redesign in *ShelfImpact!* noted that "[c]urves in the body of the new design arrest the eye with a distinctive look in the personal care aisle." *Id.* ¶17, Ex. G at G9. As the packaging industry itself has recognized, the redesigned HERBAL ESSENCES Trade Dress constitutes unique packaging and is distinctive to P&G's product lines. *See, e.g., Restatement (Third) Unfair Competition* § 16, cmt. C ("Trade dress that is unique and prominent can thus be inherently distinctive.").

RNA claims that these articles do not mention the protectable elements of P&G's trade dress, other than shape. *See* RNA Opp. Mem. at 8. RNA is wrong. The articles highlight every element averred to by Christopher Keith, including the "holographic device on the top portion of the label," the "vinelike organic device," and the product's brand name. *See* Keith Decl. ¶9; *e.g., id.*, Ex. G2 (referring to the unique and complementary bottle shape); *id.*, Ex. G3 ("a holographic logo shimmers on . . . the label"); *id.*, Ex. G7, G9 (characterizing the vinelike device as "abstract botanical patterns" and a "feminine flourish"); *id.* ("The Herbal Essences name has been liberated from the seal").

Even if the HERBAL ESSENCES Trade Dress were not inherently distinctive, it has acquired distinctiveness and secondary meaning in the public mind. Secondary meaning can be established through length and manner of use, amount and manner of advertising, volume of sales, place in the market, and proof of intentional copying, among other factors. *Thomas & Betts Corp.*, 138 F.3d at 291. Where, as here, the HERBAL ESSENCES Trade Dress was copied, there is a presumption of a strong secondary meaning. *See, e.g., Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 639 (6th Cir. 2002) ("evidence of intentional copying shows the strong secondary meaning of [a product] because [t]here is no

logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence") (quotations omitted). Furthermore, the products sold under the HERBAL ESSENCES Trade Dress have been extensively advertised and have received considerable unsolicited media coverage, creating impressive sales success for products packaged in the HERBAL ESSENCES Trade Dress, with the products achieving total annual sales of over $250 million for each of the fiscal years ending in June 2007 and 2008 – a substantial increase over prior years. *See* Keith Decl. ¶16. This extensive promotion, unsolicited media coverage and sales success all confirm the distinctiveness that the HERBAL ESSENCES Trade Dress possesses in the market.

      **The Confusing Similarity of the RNA Trade Dress.** Likely confusion in the context of trade dress infringement is evaluated under the same factors that are employed for trademark infringement claims. *See, e.g., Thomas & Betts Corp.*, 138 F.3d at 296. Here, the factors governing the analysis of likely confusion set forth above apply almost identically to the analysis of trade dress infringement:

- Goods sold under the HERBAL ESSENCES Trade Dress competed directly with RNA's Hydrating Herbal shampoos and conditioners, using the same marketing channels.

- Goods sold under the HERBAL ESSENCES Trade Dress and RNA's Hydrating Herbal shampoos and conditioners are inexpensive, and therefore customers exercise a lower degree of care when purchasing them.

- The HERBAL ESSENCES Trade Dress is fanciful in that it does not illustrate any qualities or components of the product and is therefore conceptually strong.

- The HERBAL ESSENCES Trade Dress is strong in the marketplace as the result of considerable advertising, sales, and unsolicited media coverage.

- RNA plainly designed its Hydrating Herbal shampoos and conditioners with full knowledge of the HERBAL ESSENCES Trade Dress and intended to copy that Trade Dress, creating a presumption of likely confusion.

As to the similarity of the parties' trade dress, that factor also weighs heavily in favor of likely confusion. Each of the distinctive aspects of the HERBAL ESSENCES Trade Dress already described has been incorporated by RNA into its products. The overall trade dress of the competing products, including the similarity of their unusual, vibrant, modern colors, are sufficiently similar to demonstrate a likelihood of confusion. *See, e.g., Computer Care*, 982 F.2d at 1069 (finding "incredible" any suggestion that the competitor's trade dress was created independently and concluding the materials were confusingly similar).

### 3.  RNA is Liable for Design Patent Infringement

RNA has no plausible argument against design patent infringement.  Its sole argument has been reliance on the subsequently-issued and irrelevant GK Packaging patent.  P&G has already explained why RNA's reliance on the GK Packaging design patent provides no defense. P&G Opp. Mem. at 3-5.  P&G owns four design patents relating to the HERBAL ESSENCES products, any one of those patents being sufficient to establish patent infringement.  *See* Christiansen Decl. Ex. C.  Pursuant to 35 U.S.C. § 282, the patents are presumed valid, and "[t]his presumption of validity places the burden of persuasion as well as the burden of going forward on the party asserting invalidity." *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).  RNA has not contested the validity of P&G's patents.

Design patent infringement requires comparing the claimed design to the accused design. *See, e.g., Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995); *Oddzon Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997).  The Court is to view the patented design in its entirety and determine whether "the effect of the whole design is substantially the same." *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991-92 (Fed. Cir. 1993) (citation omitted).  Minor differences between the claimed design and the accused design "cannot, and shall not, prevent a finding of infringement." *Id.* at 991 (citation omitted).

Courts apply the "ordinary observer" test to determine whether a design patent has been infringed. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008).  Under the "ordinary observer" test:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. 511, 528 (1871).  RNA has not argued that any prior art narrows in any relevant way the scope of the P&G patents.

The ordinary observer, comparing the patented ornamental design of the HERBAL ESSENCES bottle to the design of RNA's Hydrating Herbal Shampoo, perceives the two designs as substantially the same.  RNA's bottle shape is nearly identical to the patented shape, and an ordinary observer, giving such attention as a purchaser usually gives, is unlikely to identify

differences between the two bottle designs. Once RNA's baseless arguments from the GK Packaging patent are rejected, design patent liability is apparent.

## III.    P&G HAS ESTABLISHED THE FAIRNESS OF A MONETARY RECOVERY

RNA appears to rely on four reasons why P&G should not recover damages:

(A)    RNA made no profits from its sales.

(B)    RNA argues that, because it first shipped product in the first quarter of 2008 rather than the second quarter, P&G's analysis of how its sales in Family Dollar stores declined compared to its sales elsewhere after RNA's products began to be sold, is flawed.

(C)    Without making any effort to quantify the extent to which its argument might reduce damages, RNA asserts that the lack of a patent notice on the bottles creates a defense to damages under a patent theory.

(D)    P&G is responsible for the excessive delays and expense in this case.

RNA cited only the first of those arguments in the process leading to this briefing, but none of them is persuasive. The last of those four arguments was rebutted in the opening section of this brief. P&G's separate bases for liability each independently support claims for damages and attorney fees as well.

### A.    RNA Has Failed to Carry Its Burden to Prove that it Made No Profits

RNA continues to argue that its profit levels, whatever they are, insulate it from having to pay anything for the harm inflicted upon P&G. RNA relies on the Seventh Circuit *Badger Meter* case to argue that difficulties in a plaintiff proving losses or a defendant showing profits deprives P&G of any right to recovery. But *Badger Meter* held only that it was not an abuse of the district court's *discretion* to deny damages in a case in which it was difficult to prove the plaintiff's losses or the defendant's profits. 13 F.3d at 1158. Here, the parties *agree* on this Court's discretion to award or not award damages. RNA is also wrong in suggesting that compensation is the sole goal of the trademark statute. Deterrence is also "an important dimension of [Lanham Act] section 35(a)" in the Seventh Circuit. *Sands, Taylor, & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994) (upholding the district court's enhanced damages award of twice a hypothetical royalty). The court must impose a remedy that will ensure that "the guilty party will not return to its former ways and once again pollute the marketplace." *Id. Badger Meter* did not discuss, and certainly did not overrule, any of the Seventh Circuit cases justifying deterrence as a rationale for granting a monetary award. *Id.* at 1350 n. 13. The court's discretionary power to increase an award is most appropriately invoked in cases of willful infringement when the

plaintiff's loss is difficult to quantify precisely.  5 McCarthy § 30:91.  RNA simply ignored P&G's intellectual property rights long after they were called to its attention, and would apparently have continued to ignore them had its customer Family Dollar not terminated its buying because of cheaper alternatives.  Such disregard of others' rights should be deterred, even when the owner of the rights may be larger than the scofflaw.

RNA concedes that it bears the burden of establishing any deductions from its $451,000 in revenues.  RNA Opp. Mem. at 5.  Its case that it made no profits is based substantially upon a document it is just now surfacing, long after it was obligated, by Court Order and by its own representations, to produce over a year ago.  Second Lancaster Decl. ¶2.  It should not be entitled to rely on such late-produced evidence.

In the case of a deliberate infringer like RNA, several courts have held under the comparable burden of proof provision in the copyright statute that overhead costs are *not* deductible.  *Saxon v. Blann*, 968 F.2d 676, 681 (8th Cir. 1992); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985); *Allen-Myland, Inc. v. IBM Corp.*, 770 F. Supp. 1014, 1024-28 (E.D. Pa. 1991); *see* 17 U.S.C. § 504(b).  Other courts have allowed a willful infringer to deduct overhead costs, but only after the infringer satisfies a heightened burden showing a sufficient link between the claimed expenses and its production of the infringing product.  *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse*, 642 F. Supp. 2d 276, 282, 287-88 (S.D.N.Y. 2009) (citing *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 106 (2d Cir. 1999)).

In addition to claiming a deduction for the direct costs of manufacturing the Family Dollar product, RNA is now attempting to deduct indirect overhead costs, including administrative payroll, utilities, and thousands of dollars of mysterious "other costs," based upon documents it failed to produce when it was obligated to do so.  Saeed Decl. ¶¶17-19, 22-24.  The law does not permit it to do so.  A multiproduct business like RNA may not deduct general administrative expenses without demonstrating that production of the Family Dollar product increased its overhead costs.  *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F. Supp. 404, 406 (N.D. Ill. 1976).  RNA has failed to do so.  *See* Saeed Decl.  Furthermore, RNA may not approximate the proportion of overhead attributable to the Family Dollar product (as it has with payroll, freight, and utility costs) until it demonstrates that reliable data pertaining to actual

overhead is absent, which RNA has also failed to do. *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir. 1989).[5]

Even assuming that overhead could be deducted, RNA has failed to carry its burden. In estimating the overhead attributable to the Family Dollar product, RNA determined the cost of payroll, utilities, and freight using a per unit proportion. Yet RNA does not attempt to explain why this measure is proper compared, for example, to a direct measure that shows the proportion of time employees actually worked on the Family Dollar product or the number of trucks that actually transported the product. RNA states only that it can determine a per unit cost but does not explain why its logic is reasonable or accurate. *See* Saeed Decl. ¶22. In addition, RNA attempts to claim over $64,000 dollars for utilities and "other costs" without explaining what these costs are or how they are connected to the manufacture of the Family Dollar product. It is not entitled to do so.

**B. P&G's Damage Analysis Correctly Analyzes the Timing of its Infringement**

RNA argues repeatedly that, since it first shipped product in the first quarter of 2008, not the second quarter, as P&G's damage analysis assumes, P&G's entire analysis is faulty. In challenging P&G's damage analysis, RNA bases virtually its entire analysis on that assertion. But it is RNA who misanalyzes the dates. Its own documents indicate that its first shipments of shampoo were not made until very near the end of the first quarter, on March 11, 2008; and its first shipments of conditioner just a few days earlier, on March 7, 2008. Non-Confidential Redmond Decl. Ex. C. RNA has stated that, when it shipped its products, they did not go directly to Family Dollar stores, but instead to Family Dollar "distribution facilities," after which the products were again shipped at least once again before arriving at Family Dollar stores. *See* Harms Declaration attached to Second Lancaster Decl. as Exhibit A. Once arrived at stores, the products presumably did not hop onto store shelves instantaneously. In short, there is no evidence that RNA's products were being offered on Family Dollar store shelves before April 1,

---

[5] RNA cites to *Winterland Concessions Co. v. Fenton*, 835 F. Supp. 529 (N.D. Cal. 1993), which also holds that a proportional estimate of costs is appropriate only where "more precise methods of allocating costs are not available" and the defendant provides evidence that "each item included in fixed costs actually contributed to the infringing product." *Id.* at 533. RNA's assertion that it may deduct overhead it would have incurred anyway had it not produced the Family Dollar product (citing to an unpublished case from the S.D.N.Y.) is inconsistent with the law in this jurisdiction. *Baldwin Cooke Co.*, 420 F. Supp. at 406.

the beginning of the second quarter, just as P&G's analysis assumes. If they *did* beat the April 1 assumed start date, it could not have been by more than a very few days. In any event, RNA's argument that the Court should assume that the products were competing with P&G products a full three months earlier, throughout the entire first quarter of 2008, makes no sense. No evidence supports it, and no evidence supports any greater precision as to the relevant damage calculation period than P&G has offered.

### C. The Patent Notice Issue Avoids Only a Limited Period of Patent Damages and Is Irrelevant to Trademark and Trade Dress Damages

Finally, in an attempt to reduce patent damages, RNA points to the absence of patent markings on the P&G products. The argument is irrelevant to trademark and trade dress damages. The existence of a design patent does not preclude the same product from protection as a trademark under the Lanham Act. *E.g., Fuji Kogyo Co.*, 461 F.3d at 683. But in any event, because RNA had *actual* notice of P&G's patent claims by the time of the service of P&G's Ohio Complaint on August 22, 2008, the argument still cuts off less than the first half – the second and third quarters of 2008 – of the damage period. RNA makes no effort to argue that for the remaining period, the instruction of 35 U.S.C. § 289 does not apply. That section provides that the remedy for design patent infringement is at least $250 and should include the "total profit" of the infringer.

### CONCLUSION

P&G respectfully submits that incontestable aspects of the record in this case show that P&G's treatment of RNA has been nothing more than seeking to protect and enforce its intellectual property rights against a willful infringer. RNA's size is irrelevant to those efforts, which any intellectual property owner who wants to maintain its rights must undertake. P&G respectfully submits that the record further demonstrates that it has consistently sought to accomplish that legitimate goal as promptly and efficiently as possible. For the reasons stated, P&G respectfully requests that the Court award at least the $321,664 detailed in its initial damage brief at page 13, with allowance for the significant and unnecessary attorney fees RNA has forced P&G to incur since that request was made back in November 2009.

MICHAEL BEST & FRIEDRICH LLP

Dated:  June 15, 2010.                    By:  /s/Christopher R. Parker_____

Paul F. Linn (Wis. Bar. No. 1009685)
Christopher R. Parker (# 6270398)
Two Prudential Plaza
180 North Stetson Avenue
Chicago, Illinois 60611
Telephone:  (312) 222-0800

DORSEY & WHITNEY LLP
Peter M. Lancaster (MN #0159840)
  (Admitted Pro Hac Vice)
Heather D. Redmond (MN # 0313233)
  (Admitted Pro Hac Vice)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

***Attorneys for The Procter & Gamble Company***